OPINION OF THE COURT
James B. Canfield, J.
Respondents Town Board of the Town of North Greenbush, Planning Board of the Town of North Greenbush (North Green-bush), John Gallogly and Thomas Gallogly move and cross-move to strike materials and claims from the petitioners John L. Eadie, John E. Ryan, Robert C. Story, Margaret H. Story, Ann Marie Rogers, David Oles, Priscilla Oles and Defreestville Area Neighborhoods Association, Inc.’s (DANA) reply/motion to strike. DANA moves to correct and strike the proposed record, affidavits in this CPLR article 78 proceeding challenging North Greenbush’s enactment of Local Law No. 5 of 2004.
North Greenbush and the Galloglys are incorrect in believing that it is impermissible for an article 78 reply to incorporate either matters that are supportive of the petition or matters that are not contained in the petition. Matter of Stewart v County of Albany (300 AD2d 984, 985 n 1 [2002]) and Matter of Zimmerman v Planning Bd. of Town of Schodack (294 AD2d 776, 778 [2002]), the cases that North Greenbush cites in support of this claim, are inapplicable because they involve rules of appellate practice rather than the procedures governing this court’s consideration of article 78 proceedings.
In point of fact, CPLR 7804 (d) does not bar amended petitions or new arguments and allegations, and expressly authorizes the court to “permit such other pleadings as are authorized in an action upon such terms as it may specify.” While new causes of action that were not included in the original petition “generally” shohld not be interposed in the reply (Matter of Hill v New York City Tr. Auth., 222 AD2d 506, 507 [1995]), that limitation only applies to new arguments or allegations in support of the motion, if those arguments or allegations could and should have been raised initially (Potter v Blue Shield of Northeastern N.Y., 216 AD2d 773, 775 [1995]; Matter of Crawmer v Mills, 239 AD2d 844, 845 [1997]; Ritt v Lenox Hill Hosp., 182 AD2d 560, 562 [1992]). Furthermore, new arguments and allegations are clearly permitted under a number of circum *601 stances. For example, CPLR 7804 (d) makes it clear that a reply is mandatory where there is either “new matter in the answer or where the accuracy of proceedings annexed to the answer[1] is disputed.” Thus, a “reply” may properly address any issues raised in the answer and record and arguments made in opposition to the position taken by the petitioner (CPLR 7804 [d], [e]).
In order to succeed on their motions to strike arguments and allegations from DANA’s reply/motion to strike, North Green-bush and the Galloglys needed to demonstrate more than that the challenged arguments and allegations were not among those contained in the petition or that they would support the petition. They also must demonstrate that the arguments and allegations do not respond to matters raised in their answers and the administrative record and also that they could and should have been raised in the petition itself. North Greenbush and the Galloglys’ motions to strike are noteworthy for avoiding their burden of establishing that the matters are improperly raised at this time or that they have not been given the opportunity of responding to all of DANA’s arguments and allegations.
To the extent that DANA is responding to the answers and record that North Greenbush did not release until a few weeks before DANA made its reply and motion to strike, DANA has clearly not been dilatory and the respondents have certainly not been prejudiced. Article 78 contains no provision requiring would-be petitioners to first obtain all records regarding the challenged determination that can be gleaned through Freedom of Information Law (FOIL) requests prior to commencing a special proceeding. Thus, there is no basis for North Greenbush and the Galloglys arguing that DANA’s failure to make a FOIL demand or raise issues that would have been visible had records been revealed by North Greenbush requires that DANA’s arguments and allegations be stricken. By stalling the release of the records until it filed its answer in late April 2005, North Green-bush ensured that DANA’s arguments and allegations directed at the answer and new records would be timely raised in DANA’s reply. After reviewing DANA’s reply and arguments in favor of its motion to strike, the court concludes that they are permissible and therefore denies North Greenbush and the Galloglys’ motions to strike.
*602 Although DANA challenges many aspects of the process by which North Greenbush and. the Galloglys enacted Local Law No. 5, the means by which North Greenbush rejected DANA’s Town Law § 265 (1) supermajority protest is the most momentous because, if approved, it would nearly invalidate the statute in situations like this where large tracts of land are being rezoned. Town Law § 265 protects the rights of property owners who would be most adversely affected by a proposed zoning change by entitling a small fraction of the adversely affected to require that there be a supermajority vote of at least 75% in favor of a proposed zoning change before there can be a change in the status quo. Town Law § 265 (1) recognizes three distinct types of particularly interested landowners (Matter of Van Patten v LaPorta, 148 AD2d 858, 860 [1989]). The three property groups that are permitted to oppose rezoning by petitioning for a supermajority vote are:
“(a) the owners of twenty percent or more of the area of land included in such proposed change; or
“(b) the owners of twenty percent or more of the area of land immediately adjacent to that land included in such proposed change, extending one hundred feet therefrom; or
“(c) the owners of twenty percent or more of the area of land directly opposite thereto, extending one hundred feet from the street frontage of such opposite land.” (Town Law § 265 [1].)
In plain English, the three ownership classifications are (a) those whose land is being modified against their will, (b) those whose land is adjacent to land that is being modified and (c) those whose land lies across the street from land that is being modified.
DANA presented a Town Law § 265 (1) (b) protest against the rezoning of the Galloglys’ property accompanied by the signatures of the landowners who own most of the land adjacent to the Galloglys’ property. North Greenbush rejected what would appear on the surface to be an overwhelming petition based on a confidential analysis. North Greenbush withheld the analysis and documents upon which it based its conclusion until it released the record in late April 2005. The recently released analysis and documents reveal that despite the fact that Town Law § 265 and its predecessors have been on the books and governed supermajority protests for more than 50 years (see for example Deligtisch v Town of Greenburgh, 135 NYS2d 220 *603 [1954]), North Greenbush rejected the petition based on an interpretation of Town Law § 265 (1) that, at the time, had never even been considered, much less approved, by the courts of this state.
North Greenbush’s interpretation of Town Law § 265 meshed with North Greenbush and the Galloglys’ complicated and less than transparent efforts to create a novel set of facts so as to appear to meet the literal requirements of their novel interpretation. Although some of North Greenbush and the Galloglys’ activities were matters of record, many did not become evident until the documents were released and the significance of all of the maneuvers was only revealed by North Greenbush’s confidential analysis. North Greenbush and the Galloglys’ efforts included paper land transactions, where the Galloglys deeded portions of their own property to themselves and thus became their own “neighbors.” The respondents also artfully limited the supposed boundaries of the property that they characterized as being “rezoned” so that with only minor exceptions the purported “rezoning” boundary did not come within 100 feet of the Galloglys’ outer boundaries. As a result, the Galloglys hold title to nearly all of the property that is “immediately adjacent” to the land that respondents admit to “rezoning.” The opponents of rezoning run along most of the Galloglys’ boundary line but most are more than 100 feet away from the purported rezoning boundary.
North Greenbush and the Galloglys’ actions and interpretation of Town Law § 265 (1) would permit proponents of a zoning change who control the property that is being rezoned to ehminate the possibility of a successful Town Law § 265 (1) (b) or (c) protest petition by creating artificial buffer zones at the edge of their property. The central legal question is, “Who is entitled to be counted among the eligible protesters?” In addressing the legitimacy of buffer zones, the court begins by noting that it is fundamental that a court, in interpreting statutes, should attempt to effectuate the Legislature’s intent (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]; Patrolmen’s Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976]; McKinney’s Cons Laws of NY, Book 1, Statutes § 92, at 176-177).
The starting point in construing statutes is the statutory text, which is recognized as the clearest indicator of legislative intent. The court first determines whether there is a “plain meaning.” If the words employed by the Legislature have a definite mean *604 ing, which involves no absurdity or contradiction, then there is no room for construction and courts have no right to add to or take away from that meaning (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]; Tompkins v Hunter, 149 NY 117, 122-123 [1896]; Statutes § 92, at 182).
Town Law § 265 (1) does not have a “plain meaning” regarding artificial “buffer zones” or other gimmicks for depriving landowners of their right to petition for a supermajority vote by diluting or eliminating potential rezoning opponents. The statute does not endorse, reject or otherwise recognize “buffer zones.” Reading Town Law § 265 (1) literally in the context of artificial buffer zones involves considerable absurdity and contradiction. First is the spectacle of property owners like the Galloglys, who, unlike almost everyone else in the world, have arranged to become their own adjacent “neighbors,” without even buying additional property. Next, as a result of these machinations, the proponents of rezoning are nearly the only ones who meet the literal requirements for being eligible to protest against the rezoning. Finally, there is the ring of abutting landowners who are seriously affected by the rezoning and vehemently oppose rezoning, but who have lost their Town Law § 265 (1) rights because of the proponents’ artifice. Given the absurdities and contradictions that result from situations where zoning proponents manipulate the situation, the court finds that it is necessary to refer to the statute’s legislative intent in order to evaluate the respondents’ buffer zones.
The court is aware of only two cases in which the courts have addressed the question of who is eligible to sign a Town Law § 265 protest letter. It is noteworthy that both Webster Assoc. v Town of Webster (119 Misc 2d 533, 537 [1983]) and Ryan Homes, Inc. v Town Bd. of Town of Mendon (7 Misc 3d 709, 713 [2005]) consider and attempt to implement the Legislature’s intent in answering the question. After turning its attention from the dictionary definition of “directly opposite”[2] Webster sought to find and then follow the legislative intent in determining *605 whether a particular property owner was eligible. Webster found that “[t]he purpose of a greater than majority vote is to provide additional protection to those property owners who would be most affected by a zoning change” (Webster Assoc. v Town of Webster, 119 Misc 2d 533, 537 [1983]; Ryan Homes, Inc. v Town Bd. of Town of Mendon, 7 Misc 3d 709, 712 [2005]). Webster then focused on the fact that the protester’s property was 400 to 500 feet from the rezoning, that the intervening “street” was part of the highway system and blocked the protester’s view of the rezoned property. Based on its analysis of those factors, none of which are to be found in the statute proper, Webster found that the protester was outside the group of property owners that the Legislature intended to protect. The protester was excluded from eligibility to protest because the protester’s land “would not be significantly affected by a zoning change and does not fall within the category of property intended to be protected by section 265 of the Town Law.” (Webster Assoc. v Town of Webster, 119 Misc 2d 533, 537 [1983].)
The first part of Ryan Homes, Inc. v Town Bd. of Town of Mendon (7 Misc 3d 709, 713 [2005]) addressed a very similar situation to that addressed in Webster Assoc. v Town of Webster. The court followed the prior decision’s lead. It found that it was “important” that the protester, who was directly opposite on the other side of the 330-to-690-foot-wide New York State Thruway “has made absolutely no showing how his property would be detrimentally impacted or significantly affected by the zoning change” (Ryan Homes, Inc. v Town Bd. of Town of Mendon, 7 Misc 3d 709, 713 [2005]).
Ryan Homes was not decided until after this litigation was commenced. When considering the second part of the case, the court endorsed “buffer zones” unreservedly (Ryan Homes, Inc. v Town Bd. of Town of Mendon, 7 Misc 3d 709, 713-714 [2005]). As the decision of a concurrent court, that decision is not binding on this court (Siegel, NY Prac § 449, at 724 [3d ed]). For the reasons that follow, the court finds that Ryan Homes’ reasons for recognizing buffer zones as a legitimate basis for determining eligibility of Town Law § 265 (1) protesters is not persuasive and the court declines to follow it.
Ryan Homes’ approval of buffer zones is based on several faulty assumptions and conclusions. The first of these assump *606 tians seems to be that there is no legislative intent to be found in the statute itself that could guide the court in interpreting Town Law § 265 (1). That assumption is directly at odds with both Webster Assoc. v Town of Webster (119 Misc 2d 533, 537 [1983]) and Ryan Homes, Inc. v Town Bd. of Town of Mendon (7 Misc 3d 709, 712 [2005]) itself. As noted previously, both decisions recognized the legislative intent to protect the property rights of landowners who are adversely affected by allowing them to oppose rezoning. Both decisions relied on that legislative intent when they interpreted Town Law § 265 (1) (c) so as to exclude would-be protesters who were “directly opposite” the land to be rezoned, but were not adversely affected by the rezoning. It is ironic that having employed legislative intent in order to invalidate the Town Law § 265 (1) petition by declaring that a property owner that met the statutory definition was not eligible because it was not adversely affected, Ryan Homes could ignore the legislative intent in order to deprive adversely affected property owners of the opportunity to protest. Ryan Homes does not even acknowledge its double standard, much less explain why the Legislature’s intent to protect adversely affected property owners should only operate against property owners that are not affected.
Ryan Homes’ assumption that the absence of “legislative history” to provide guidance regarding legislative intent or purpose somehow undercuts the Town’s analysis of legislative intent and purpose is also illogical. The absence of legislative history does not equate with an absence of either legislative intent or purpose. There being “no” legislative history, it was illogical for the court to cite the absence of evidence as though it undercut the Town’s arguments regarding the legislative intent behind Town Law § 265 (1).
Ryan Homes’ conclusion that New York should jump on the bandwagon with the handful of other states that allow “buffer zones” is illogical and its suggestion that those cases present the “overwhelming rule” is incorrect. The fact that other states have done something is not a logical argument why this state should follow their lead. Given the long-standing and widespread use of supermajority statutes like Town Law § 265 (1) in both this and other states across the nation, the fact that Colorado, Texas, New Mexico, Wisconsin and North Carolina have considered and allowed buffer zones hardly establishes an “overwhelming rule.” Indeed, the fact that there is more than 50 years of history behind this statute in this state and the is *607 sue of buffer zones had never been previously raised suggests that the attempted use of buffer zones has been the overwhelming exception, not the rule. Of course it would be just as illogical for the court to dismiss the decisions of foreign courts without first considering their analysis. After considering the arguments for allowing buffer zones that are used in those decisions, the court is not persuaded that their analysis is correct.
Ryan Homes’ failure to acknowledge, much less consider and distinguish the Illinois and Arizona decisions that refuse to give unconditional approval to buffer zones, also weighs against its analysis. Those decisions present cogent reasons for not accepting artificial buffers at face value. When presented with buffers, they recognized the potential harm that would come from blindly accepting buffers and other gimmicks and found that courts must look at the reality of the situation and inquire into their bona fides on a case-by-case basis (Herrington v Peoria County, 11 Ill App 3d 7, 295 NE2d 729 [1973]; Schwarz v City of Glendale, 190 Ariz 508, 950 P2d 167 [1997]).
The court next rejects Ryan Homes’ acceptance of the speculation that when the Legislature enacted a statute setting a distance to be measured, “[fit must have believed that property owners beyond that line would be adequately protected by the normal process in which a simple majority vote is required” (Ryan Homes, Inc. v Town Bd. of Town of Mendon, 7 Misc 3d 709, 713 [2005]). As a disguised form of legislative intent, that supposition is inconsistent with Ryan Homes’ position that there is no intent. The court also notes that that supposed legislative intent rests on the implausible assumption that the Legislature anticipated and/or accepted buffer zones and other gimmicks when it enacted Town Law § 265 (l)’s predecessor in 1909 or sometime during the intervening decades, despite the fact there are no documented prior attempts in this state to use buffer zones or other gimmicks to eliminate the possibility of successful supermajority petitions. The court concludes that the Legislature did not expect such efforts to circumvent Town Law § 265 (1). It instead appears that the Legislature expected that property owners who sought to rezone their own property would seek to rezone their entire property and, thus, that those who would be eligible to seek a supermajority vote would be the proponent’s neighbors rather than the proponents themselves.
Ryan Homes’ rationalization that the Legislature intended the 100-foot measure employed in Town Law § 265 (1) (b) and (c) to correlate with the distance at which property owners are *608 no longer strongly affected by zoning changes is also unconvincing. To begin with, the premise is invalid, especially in cases such as this where large tracts of property are to be rezoned, because it is patently obvious that the negative impacts of rezoning are often very significant at distances far beyond a 100-foot fringe. The court discerns no basis for concluding that the New York State Legislature did not recognize that fact or that the Legislature concluded that nearby property owners who are outside the 100-foot border have no greater interest in rezoning than property owners on the opposite side of the town. Thus, the court finds that Town Law § 265 (1) (b) and (c)’s 100-foot limit was not intended to disenfranchise property owners outside the 100-foot border as Ryan Homes suggests.
The court concludes that the 100-foot measure was actually used by the Legislature in order to make it easier for successful protests to be filed. It is obvious that larger areas of eligible protesters would correlate with larger numbers of landowners who would need to be canvassed and then sign the protest in order to meet the 20% requirement. By establishing a 100-foot measure rather than a distance that would coincide with the extent of adverse impact, the Legislature favored supermajority protests by greatly reducing the burden of collecting sufficient signatures. Courts have already recognized other instances where Town Law § 265 (1) reduces the burden for adversely affected property owners by reducing the area of eligible protesters. In Matter of Van Patten v La Porta (148 AD2d 858, 860 [1989]), the Court recognized that by distinguishing between property owners that abut the property (Town Law § 265 [1] [b] ) and those that are across the street (Town Law § 265 [1] [c] ), the number of potential eligible protesters in each category is diminished and the statute thereby creates a “far less stringent burden” on protesters than if the two categories were combined into one. Thus, the court concludes that the New York Legislature intended that the Town Law § 265 (1) 100-foot border would benefit all adversely affected property owners by making it easier to protest and assumed that the property owners located within 100 feet could and would adequately represent the interests of their strongly affected neighbors outside of the border.
For these reasons, the court concludes that artificial buffer zones or other means of artificially suppressing the property rights of adversely affected property owners are completely antithetical to the purposes of Town Law § 265 (1) and may not *609 be used by towns or approved of by the courts as a means of squelching supermajority petitions. When towns are confronted by protest petitions that are only susceptible to attack based on the petitioners’ property being outside the 100-foot fringe or being isolated by some other device, such as a narrow slice along street frontage, it is incumbent on the towns as an absolute minimum to answer the following questions:
“(1) Is the unincluded intervening area limited and capable of definite description?
“(2) Will the use of the unincluded property be related to and dependent upon the proposed use of the described property?
“(3) After rezoning of the described property will the unincluded property be suitable for use as authorized by the pre-existing and continuing zoning?
“(4) May the described property be used in accord with its altered zoning classification independent of and without regard to the use of the intervening area?” (Herrington v Peoria County, 11 Ill App 3d 7, 12, 295 NE2d 729, 732 [1973].)
Where the town or court finds that the border is not properly described, or that it remains related to or its future use will be ancillary to or dependent upon the property that is being rezoned, or will not be usable as a practical matter, then the 100-foot border may be moved out to the point where the property of nearby landowners who are adversely affected commences.
The administrative record produced by North Greenbush demonstrates that it misinterpreted Town Law § 265 (1) so as to permit proponents of zoning change to terminate the rights of those who are adversely affected by the change without ehminating the adverse affect of the zoning change. While North Greenbush and the Galloglys deserve credit for using 200-, and sometimes even 400-foot borders when 100-foot borders would have been technically sufficient according to their interpretation of Town Law § 265, North Greenbush nevertheless failed to ask the pertinent questions. North Greenbush did not inquire into the bona fides of the Galloglys’ land transactions with themselves or the placement of the rezoning boundaries more than 100 feet inside of the Galloglys’ outer boundary lines. North Greenbush and the Galloglys cooperated in creating the mirage and nearly precluding the possibility of a successful supermajority protest petition. North Greenbush did not establish *610 that the buffer zone that it and the Galloglys created constitutes a viable, independent property. North Greenbush not only failed to consider whether the protesters were adversely affected by the rezoning, but North Greenbush demonstrated the intention of eliminating the protesters’ rights, if at all possible. Indeed, in addition to the inherently ancillary quality of the buffer zones, DANA points out that minor zoning changes included in the rezoning would have the effect of making the buffers more available for use by future commercial landowners in the adjoining property.
The court concludes that, under these circumstances, DANA’s protest petition signed by the owners of the majority of the land abutting the Galloglys’ property meets the requirements of Town Law § 265 (1) (b). As a result, North Greenbush’s rejection of the petition was unfounded and North Greenbush was required by Town Law § 265 to meet the required 75% minimum before the rezoning could be approved. The court further finds that North Greenbush’s rezoning vote did not meet the required 75% minimum required by Town Law § 265 (1) and therefore North Greenbush’s rezoning was not properly approved.
Accordingly, the court vacates North Greenbush’s Local Law No. 5 of 2004. Having vacated Local Law No. 5, the remaining issues raised by DANA are academic and need not be addressed at this time. The court notes its agreement with respondents that any challenge to North Greenbush’s failure to include Oak-hill in its environmental review process is now barred by res judicata. The court further finds that North Greenbush’s environmental review was properly challenged by DANA. It bears the marks of having been largely predetermined by the Town’s unrelenting desire to hastily rezone the Galloglys’ property so that it can be developed with big box stores. In its haste to promote development, North Greenbush has taken steps that make the environmental costs of that type of development appear smaller than they actually are, and failed to mitigate the real environmental impact when it would have been possible to do so and still foster development. In addition to the environmental shortcuts, it also appears to have understated the financial costs to the taxpayers of its plan for developing the area as a commercial hub.

. The “proceedings annexed to the answer” refer in part to CPLR 7804 (e), which requires the administrative respondent to “file with the answer a certified transcript of the record of the proceedings under consideration.”

. The Webster court attempted (at 536) to support its decision by interpreting the phrase “directly opposite” as meaning “immediately across from without anything intervening.” That interpretation is doubtful in the context of this statute in which there is always some form of “street” “intervening” between the opposites. The court finds that in the context of Town Law § 265 (1) (c) “directly” opposite actually means “squarely” opposite, or opposite “in a straight line” or “by the shortest way” (see Webster’s Third New International Dictionary 641 [1986]). Thus, the protester’s property in Webster actually was “directly opposite” the property that was being *605 rezoned and the decision actually rests solely on the court’s implementing the legislative intent rather than following the dictionary definition of “directly opposite.”